IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–02417–EWN–BNB


JACQUELINE E. LEE,

     Plaintiff,

v.

UNIVERSITY OF COLORADO, through
its Board, the Regents of the University of
Colorado, a body corporate,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is an employment discrimination case. Plaintiff Jacqueline E. Lee asserts that she was

denied tenure based on her race and gender in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and Title IX of the Education Amendments of

1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"). This matter is before the court on Defendant's

"Motion to Dismiss," filed on March 23, 2007, and "University's Motion for Summary

Judgment," filed August 6, 2007. Jurisdiction is premised upon 28 U.S.C. §§ 1331, 1367.

## FACTS

### 1. *Factual Background*

     The Board of Regents of the University of Colorado governs a system of university

campuses, including the University of Colorado at Boulder ("UCB") campus. (University's Mot.

for Summ. J. [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 3 [filed Aug. 6, 2007]; *admitted at* Pl.'s Resp. to Def.'s Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Resp. to Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶ 3 [filed Sept. 25, 2007].) Under Colorado law, the Regents are empowered to enact laws governing the entire university. *See* Colo. Rev. Stat. § 23–20–112 (2007).

### a.     Tenure System Overview

The Regents have promulgated laws governing the award of tenure. (Def.'s Br., SOF ¶ 4; *admitted at* Pl.'s Resp., RSOF ¶ 4.) The *Laws of the Regents* provide: "Tenure may be awarded only to faculty members with demonstrated meritorious performance in each of the three areas of teaching, research or creative work, and service, and demonstrated excellence in either teaching, or research or creative work." (*Id.*, Ex. 1, Attach. 2, art. 5.B.4(B) [*Laws of the Regents*].)

### i.     Department Criteria

Under the *Laws of the Regents*, the Department of Molecular Cellular and Developmental Biology ("MCDB") is a "primary unit." (*Id.*, SOF ¶ 10; *admitted at* Pl.'s Resp., RSOF ¶ 10.) Each primary unit is tasked with developing written criteria for measuring the performance of its tenure candidates. (*Id.*, Ex. 1, Attach. 2, art. 5.B.5(A)(2) [*Laws of the Regents*].) These criteria "shall be included in the candidate's dossier and must be used by all other bodies or persons as part of their evaluation of the candidate." (*Id.*)

Under MCDB's primary unit criteria, a tenure candidate's research is to be evaluated for: (1) publication of "originality and importance," especially in "peer-reviewed journals or in prestigious symposium volumes;" (2) extramural grants, which although not required in specific

amounts, should be sufficient to support "an active research program;" (3) the candidate's

national and international reputation, as evinced by letters from reviewers outside of UCB; and (4)

other evidence of achievement in research that is appropriate for a particular candidate's case.

(Pl.'s Resp., Ex. 2 § 4 [MCDB Tenure Policy].)

A candidate's dossier typically consists of: (1) the candidate's curriculum vitae ("CV");

(2) a statement about research, teaching, and service efforts; (3) copies of the candidate's

publications; (4) external letters of evaluation; and (5) student evaluations. (Def.'s Br., SOF ¶ 12;

*admitted at* Pl.'s Resp., RSOF ¶ 12.)

### ii.     *Plaintiff's Achievements at the University*

In January 1997, Plaintiff, an Asian-American female, began working as a tenure-track

assistant professor for MCDB.[1] (Pl.'s Resp., Statement of Additional Facts [hereinafter "SAF"] ¶

5; *admitted at* University's Reply in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Reply"],

Resp. Concerning Statement of Additional Facts [hereinafter "RSAF"] ¶ 5 [filed Oct. 15, 2007].)

Tenure-track assistant professors generally undergo one pretenure review for reemployment,

typically during their third year of service. (*Id.*, SAF ¶¶ 10–11; *admitted at* Def.'s Reply, RSAF

¶¶ 10–11.)

In September 1999, Plaintiff underwent her pretenure review, which noted that Plaintiff

had excellent research funding, an excellent record of publication, and an excellent reputation in

the scientific community. (*Id.*, SAF ¶¶ 14–16; *admitted at* Def.'s Reply, RSAF ¶¶ 14–16.) There

---

[1]Hereinafter, the court refers to the period running from January 1997 to the tenure
decision in June 2005 as Plaintiff's "probationary period."

was no indication that Plaintiff's extramural research funding was unsatisfactory. (*Id.*, SAF ¶ 17; *admitted at* Def.'s Reply, RSAF ¶ 17.) Dr. Philip DiStefano, who was then UCB's Vice-Chancellor for Academic Affairs, gave Plaintiff a positive review. (*Id.*, SAF ¶¶ 10–11; *admitted at* Def.'s Reply, RSAF ¶¶ 10–11.)

Plaintiff was to be reviewed for tenure during the 2003–2004 academic year, but this review was not completed due to "procedural concerns," such as that the MCDB Chair participated as a voting member rather than as an *ex officio* member, in contravention of relevant rules. (Def.'s Br., SOF ¶ 7; *admitted at* Pl.'s Resp., RSOF ¶ 7.) Thus, Plaintiff was reviewed for tenure during the 2004–2005 academic year and only this review resulted in a final determination. (*Id.*, SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.)

Plaintiff's tenure dossier contained thirteen external letters of review. (*See* Pl.'s Resp., SAF ¶ 32; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 32.) Only twelve letters are in evidence. (*See id.*, Exs. 9–20 [External Letters].) Of the twelve letters, ten explicitly recommend tenure. (*See id.*) In general, the evaluations consistently state that Plaintiff's: (1) publication record was of modest quantity but of high quality, appearing in prestigious journals; and (2) research focus was complex and time-consuming. (*See id.*)

Although Plaintiff does not allege as much, the court will presume that her dossier contained evidence of lectures Plaintiff was invited to give. During her probationary period, Plaintiff was invited to give lectures at five major international scientific conferences and three smaller gatherings. (*Id.*, SAF ¶¶ 73–74; *admitted at* Def.'s Reply, RSAF ¶¶ 73–74.)

Presumably, the dossier also contained evidence of grants received. During her probationary period, Plaintiff received about $2,150,000 in grants. (*Id.*, SAF ¶ 63; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 63.) The $2,150,000 figure includes approximately $800,000 from three grants that were awarded to Plaintiff prior to her probationary period, but which funded Plaintiff's initial work at UCB. (*See id.*, Ex. 1 JL–7 [Pl. Funding Chart].) The $2,150,000 figure also includes about $700,000 in funds that were not awarded exclusively to Plaintiff. (*Id.*)

### b. *Plaintiff's Review Process*

The tenure-review process is multilayered: "Every candidate for tenure or promotion shall be reviewed by the primary unit (advised by its evaluation committee), the dean (advised by a college or school-level review committee), and the chief academic officer (advised by a campus-level advisory committee)." (Def.'s Br., Ex. 1, art. 5.B.5(C) [*Laws of the Regents*].)

### i. *Department-Level Review*

1. OVERVIEW — MCDB's Primary Unit Evaluation Committee ("PUEC") first votes on a tenure decision, and then forwards its recommendation to the department's tenured faculty, where a two-thirds favorable vote is required to receive a departmental recommendation for tenure. (*Id.*, SOF ¶¶ 13–14; *admitted at* Pl.'s Resp., RSOF ¶¶ 13–14.) The department then forwards its recommendation for college-level review. (*Id.*, SOF ¶ 15; *admitted at* Pl.'s Resp., RSOF ¶ 15.)

2. PLAINTIFF'S REVIEW — In November 2004, MCDB's PUEC voted, two-to-one, to recommend Plaintiff for tenure. (*Id.*, SOF ¶ 12; *admitted at* Pl.'s Resp., RSOF ¶ 12.) Thus, the

PUEC forwarded its recommendation to the department's tenured faculty, which voted, ten-to-eight, against tenure. (*Id.*, SOF ¶¶ 14–15; *admitted at* Pl.'s Resp., RSOF ¶¶ 14–15.)

### ii. *College-Level Review*

1. OVERVIEW — From a department, the Personnel Committee of the College of Arts and Sciences takes up review, advising the Dean of the College of Arts and Sciences. (*Id.*, SOF ¶ 16; *admitted at* Pl.'s Resp., RSOF ¶ 16.) If the Personnel Committee does not concur with the department recommendation, it may return the case for reconsideration. (*Id.*) Ultimately, the Dean recommends for or against tenure. (*Id.*, SOF ¶ 20; *admitted at* Pl.'s Resp., RSOF ¶ 20.)

2. PLAINTIFF'S REVIEW — In February 2005, the Personnel Committee voted, six-to-six, not to concur with MCDB's recommendation and returned Plaintiff's case to the department for reconsideration. (*Id.*, SOF ¶ 17; *admitted at* Pl.'s Resp., RSOF ¶ 17.) In March 2005, MCDB: (1) reconsidered the case; (2) voted, eleven-to-six, against tenure; and (3) returned the case to the Personnel Committee. (*Id.*, SOF ¶ 18; *admitted at* Pl.'s Resp., RSOF ¶ 18.) Thereafter, the Personnel Committed concurred, seven to four, with MCDB's recommendation. (*Id.*, SOF ¶ 19; *admitted at* Pl.'s Resp., RSOF ¶ 19.) After reviewing Plaintiff's dossier and the previous recommendations, Dean Todd Gleeson recommended that tenure be denied. (*Id.*, SOF ¶ 20; *admitted at* Pl.'s Resp., RSOF ¶ 20.)

### iii. *Campus-Level Review*

1. OVERVIEW — The Vice Chancellor's Advisory Committee ("VCAC") proceeds with the next level of review, advising the Provost. (*Id.*, SOF ¶ 21; *admitted at* Pl.'s Resp., RSOF ¶ 21.) If VCAC does not agree with the Dean's decision, it may return the case for reconsideration.

(*Id.*)  Ultimately, the Provost recommends for or against tenure.  (Def.'s Br., SOF ¶ 25; *admitted at* Pl.'s Resp., RSOF ¶ 25.)

2.  PLAINTIFF'S REVIEW — In May 2005, VCAC unanimously recommended that Plaintiff receive tenure and returned Plaintiff's dossier to Dean Gleeson for reconsideration.  (*Id.*, SOF ¶ 22; *admitted at* Pl.'s Resp., RSOF ¶ 22.)  Upon reconsideration, Dean Gleeson again voted against tenure and returned the case to VCAC.  (*Id.*, SOF ¶ 23; *admitted at* Pl.'s Resp., RSOF ¶ 23.)  VCAC again unanimously recommended tenure and forwarded the recommendation to Interim Provost Susan Avery.  (*Id.*, SOF ¶ 24; *admitted at* Pl.'s Resp., RSOF ¶ 24.)  Provost Avery accepted VCAC's recommendation.  (*Id.*, SOF ¶ 25; *admitted at* Pl.'s Resp., RSOF ¶ 25.)

### iv.    *The Chancellor's Determination*

1.  OVERVIEW — The final tenure determination, subject to limited review by the President of the University and the Board of Regents, rests with the Chancellor.  (*Id.*, SOF ¶¶ 26, 32; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 26, 32.)

2.  PLAINTIFF'S REVIEW — At the time of Plaintiff's review, Dr. DiStefano was Chancellor.  (*Id.*, SOF ¶ 29; *admitted at* Pl.'s Resp., RSOF ¶ 29.)  By the time Dr. DiStefano reviewed Plaintiff's dossier and the recommendations from below, approximately fifty faculty members and administrators had reviewed the case.  (*Id.*)

Dr. DiStefano represents that he did not compare Plaintiff to any other past tenure candidate because he believes every candidate should be evaluated by his or her "unique indicia of

performance." (*Id.*, SOF ¶ 30; *deemed admitted at* Pl.'s Resp., RSOF ¶ 30; Def.'s Br., Ex. 1 ¶ 25 [DiStefano Aff.].)[2]

Those who previously reviewed Plaintiff's candidacy agreed that she had not demonstrated excellence in teaching, but disagreed as to whether she had shown excellence in research. (*See* Def.'s Br., SOF ¶ 31; *admitted at* Pl.'s Resp., RSOF ¶ 31.) Thus, Dr. DiStefano's review focused on whether Plaintiff had demonstrated excellence in research. (*Id.*) In evaluating whether any candidate demonstrates excellence in research, Dr. DiStefano considers only research works published and grants attained since the candidate joined the UCB faculty. (*Id.*, SOF ¶ 40; *admitted at* Pl.'s Resp., RSOF ¶ 40.)

In Dr. DiStefano's estimation, Plaintiff's record of published works demonstrated a modest volume of well-received articles since joining MCDB. (*Id.*, SOF ¶ 33; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 33.) Thus, Dr. DiStefano asserts that he determined that Plaintiff's publication record fell short of establishing "excellence in research." (*Id.*, Ex. 1 ¶ 28 [DiStefano Aff.].)

Dr. DiStefano asserts that, in evaluating a candidate's grants, he considers whether the candidate is the principal investigator on the grant. (*Id.*, SOF ¶ 34; *deemed admitted at* Pl.'s

_____

[2]Plaintiff denies Dr. DiStefano's testimony, stating: "The assertions in this paragraph are argumentative and therefore are denied." (Pl.'s Resp., RSOF ¶ 30.) While it is true that my procedural rules prohibit legal argument in the factual sections of summary judgment briefs, Dr. DiStefano's testimony hardly constitutes legal argument. (*See* Practice Standards — Civil: Special Instructions Concerning Motions for Summary Judgment ¶ 7.) Plaintiff's unsupported, vague, and conclusory denial does not create an issue of fact. Plaintiff denies further averments on the same grounds. (*See* Def.'s Br., SOF ¶¶ 32, 37, 41; *denied at* Pl.'s Resp. RSOF ¶¶ 32, 37, 41.) Those averments, along with Defendant's paragraph thirty, are hereby deemed admitted.

Resp., RSOF ¶ 34; Def.'s Br., Ex. 1 ¶ 29 [DiStefano Aff.].)[3] Dr. DiStefano believes that

receiving a grant as a principal investigator is important because it shows recognition by experts in

the candidate's field of the importance of his or her work. (Def.'s Br., SOF ¶ 35; *admitted at*

Pl.'s Resp., RSOF ¶ 35.) Plaintiff claims that neither "the MCDB Chair [nor] any other tenured

MCDB member [advised her] that being designated the [principal investigator] on a grant was of

any significance in the tenure review period." (Pl.'s Resp., SAF ¶ 71.) Defendant admits that this

was the case because the Chair did not have a specific practice "of telling any tenure candidate

that it was important to be awarded grants as opposed to being the recipients [sic] of funds from

grants awarded to others." (Def.'s Reply, RSAF ¶ 71.) In Dr. DiStefano's estimation, the two

new research grants Plaintiff had received since joining the UCB faculty — one for $445,000 and

another for $165,000 — were insufficient to demonstrate "excellence in research." (*Id.*, SOF ¶

36; *deemed admitted at* Pl.'s Resp., RSOF ¶ 36.)[4]

---

[3]Plaintiff denies Dr. DiStefano's statement, asserting that whether a candidate is a principal investigator is unimportant. (Pl.'s Resp., RSOF ¶ 34.) In contravention of my procedural rules, Plaintiff neglects to cite any evidence in support of her denial. (*See* Practice Standards — Civil: Special Instructions Concerning Motions for Summary Judgment ¶ 4 ["Any denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial."].) Thus, Defendant's factual proffer is deemed admitted.

[4]Plaintiff denies this allegation without explanation, instead referring the court to five paragraphs of her affidavit. (Pl.'s Resp., RSOF ¶ 36.) In these paragraphs, Plaintiff offers various calculations of the grants she received. (*See id.*, Ex. 1 ¶¶ 22–27 [Pl. Aff.].) None of her calculations undermine Dr. DiStefano's assertion that, since joining the UCB faculty in 1997, Plaintiff was awarded only two grants as principal investigator totaling approximately $600,000. (*See id.*) Indeed, Plaintiff's own funding summary *confirms* this conclusion. (*See id.*, Ex. 1 JL–7 [Pl. Funding Chart].) Consequently, Defendant's asserted fact is deemed admitted.

Dr. DiStefano also considered external letters of review UCB had obtained from professors working in Plaintiff's discipline at other institutions. (*Id.*, SOF ¶ 38; *admitted at* Pl.'s Resp., RSOF ¶ 38.) Dr. DiStefano testified that he found Plaintiff's letters to be complimentary, but lacking in "indicators of excellence in research in light of [Plaintiff's] publication record and history of funding." (*Id.*, Ex. 1 ¶ 33 [DiStefano Aff.].)

Dr. DiStefano denied Plaintiff tenure in June 2005. (*Id.*, SOF ¶ 41; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 41.) Thereafter, Plaintiff appealed Dr. DiStefano's decision through various routes within UCB, but did not obtain relief. (*Id.*, SOF ¶ 42; *admitted at* Pl.'s Resp., RSOF ¶ 42.)

### c.    *Plaintiff's Meeting with the Chancellor*

Plaintiff requested a meeting with Dr. DiStefano soon after he denied her tenure. (Pl.'s Resp., SAF ¶ 81; *admitted in relevant part at* Def.'s Reply, RSAF ¶ 81.) On June 27, 2005, Dr. DiStefano notified Plaintiff that he would not meet with her. (*Id.*, SAF ¶ 82; *admitted at* Def.'s Reply, RSAF ¶ 82.) The same day, Plaintiff again asked for a meeting, emphasizing her entitlement under Defendant's "Faculty Handbook" for a confidential conversation about "the reasons which contributed to a recommendation" against tenure. (*Id.*, SAF ¶¶ 80, 83; *admitted in part at* Def.'s Reply, RSAF ¶¶ 80, 83.) On June 28, 2005, Dr. DiStefano notified Plaintiff that he would meet with her. (*Id.*, SAF ¶ 84; *admitted at* Def.'s Reply, RSAF ¶ 84.)

On July 1, 2005, Plaintiff and Dr. DiStefano met; the meeting was recorded by mutual consent, but the recording is of poor quality. (*Id.*, SAF ¶¶ 85–86; *admitted at* Def.'s Reply, RSAF ¶¶ 85–86.) Plaintiff asserts that Dr. DiStefano "refused to advise [her] of any specific

reason which contributed to his rejection of her tenure candidacy." *Id.*, SAF ¶ 87; *denied at*
Def.'s Reply, RSAF ¶ 87.) Defendant proffers the transcript of the record to counter this
assertion. (Def.'s Reply, Ex. 6, Attach. D at 1–14 [Meeting Trans.].)

### d. The Comparitor: Dr. Jones

MCDB accepted Dr. Kevin Jones, a white male, as a tenure-track assistant professor in
1994. (*Id.*, SAF ¶ 96; *admitted at* Def.'s Reply, RSAF ¶ 96.) Dr. Jones' and Plaintiff's research
programs are quite similar, both involving the manipulation of the genes of mice. (*Id.*, SAF ¶ 99;
*admitted at* Def.'s Reply, RSAF ¶ 99.) Plaintiff and Dr. Jones are about the same age, completed
their doctoral training at about the same time, and were accepted as tenure-track associate
professors at about the same time. (*Id.*, SAF ¶ 104; *admitted at* Def.'s Reply, RSAF ¶ 104.)

Dr. Jones' pretenure review process, which took place in 1998, was "difficult" due to his
"spartan" research program. (*Id.*, SAF ¶¶ 105–07; *admitted at* Def.'s Reply, RSAF ¶¶ 105–07.)
The review was ultimately favorable, noting that Dr. Jones' work was at a similar stage to that of
Plaintiff and two other researchers. (*Id.*, SAF ¶ 108; *admitted at* Def.'s Reply, RSAF ¶ 108; *see*
Pl.'s Resp., Ex. 25 [Jones Review].)

During his probationary period, Dr. Jones published the same number of articles as
Plaintiff, but his articles generally appeared in less prestigious journals than did Plaintiff's. (Pl.'s
Resp., SAF ¶¶ 50, 52–61, 115–16; *admitted at* Def.'s Reply, RSAF ¶¶ 50, 52–61, 115–16.)
Additionally, Dr. Jones' articles were cited much less frequently than were those of Plaintiff. (*Id.*,
SAF ¶¶ 61, 117; *admitted at* Def.'s Reply, RSAF ¶¶ 61, 117.)

During his probationary period, Dr. Jones received six grants totaling approximately $1,200,000. (*Id.*, SAF ¶ 122; *admitted at* Def.'s Reply, RSAF ¶ 122.) During the same time, Dr. Jones was invited to speak at nine seminars, five in Colorado, two in Wyoming, one in Kansas, and one in California. (*Id.*, SAF ¶ 127; *admitted at* Def.'s Reply, RSAF ¶ 127.)

There were eleven external letters in Dr. Jones' dossier, but Plaintiff only submitted ten to this court. (*Id.*, SAF ¶ 128; *admitted at* Def.'s Reply, RSAF ¶ 128; *see* Pl.'s Resp., Exs. 27–36 [External Letters].) Five letters explicitly support Dr. Jones' promotion. (*See* Pl.'s Resp., Exs. 27–36 [External Letters].) Generally, the letters are critical of the slow start Dr. Jones had at UCB with research and publishing, but they also noted that his productivity was on a sharp upswing. (*See id.*)

Dr. Jones was considered for tenure in 2002. (Pl.'s Resp., SAF ¶ 109; *admitted at* Def.'s Reply, RSAF ¶ 109.) Dr. DiStefano, who was then UCB's Provost, recommended that Dr. Jones be granted tenure. (*Id.*, SAF ¶ 112; *admitted at* Def.'s Reply, RSAF ¶ 112.) Dr. Jones was granted tenure effective August 19, 2002, after a review by "all of the key players" in Plaintiff's tenure case. (*Id.*, SAF ¶ 111; *admitted at* Def.'s Reply, RSAF ¶ 111.) The same policies effective during Plaintiff's review were effective during Dr. Jones' review. (*Id.*, SAF ¶ 114; *admitted at* Def.'s Reply, RSAF ¶ 114.)

### e. *The Yoshinaga-Itano Email*

At all relevant times, Dr. Christine Yoshinaga-Itano was the Vice-Provost and Associate Chancellor for the Office of Diversity and Equity ("ODE") at UCB. (*Id.*, SAF ¶ 88; *admitted at* Def.'s Reply, RSAF ¶ 88.) The ODE's functions include ensuring equal opportunities for faculty

and staff. (*Id.*, SAF ¶ 90; *admitted at* Def.'s Reply, RSAF ¶ 90.) In connection with Plaintiff's

first tenure review, Dr. Yoshinaga-Itano sent an email to Dr. DiStefano, asserting that Plaintiff's

tenure denial was "a clear case of gender and racial discrimination" because MCDB "use[d]

significantly different criteria in the evaluation of a white male in the same area of research." (*Id.*,

SAF ¶¶ 94–95; *admitted at* Def.'s Reply, RSAF ¶¶ 94–95.)

**2.    *Procedural History***

On December 4, 2006, Plaintiff filed a complaint in this court, alleging she had been

denied tenure based on her race and gender in violation of: (1) Titles VI and VII of the Civil

Rights Act of 1964; and (2) Title IX of the Education Amendments of 1972. (Compl. and Jury

Demand [filed Dec. 4, 2006].) On February 12, 2007, this court granted Plaintiff's request to

strike her Title VI claim. (Order [filed Feb. 12, 2007].)

On March 23, 2007, Defendant filed a motion to dismiss Plaintiff's Title IX claim, arguing

that Title IX does not provide a private cause of action for employment discrimination where Title

VII provides a remedy. (Mot. to Dismiss [filed Mar. 23, 2007].) On April 16, 2007, Plaintiff

filed a response. (Pl.'s Resp. to Def.'s Mot. to Dismiss [filed Apr. 16, 2007].) On April 24,

2007, Defendant filed a reply. (Reply in Supp. of Mot. to Dismiss [filed Apr. 24, 2007].)

On August 6, 2007, Defendant filed a motion for summary judgment, arguing Plaintiff's

Title VII and Title IX claims fail because: (1) Plaintiff cannot establish a *prima facie* case of

discrimination; and (2) Plaintiff cannot produce evidence that Defendant's purportedly legitimate,

nondiscriminatory reason for not granting tenure was a pretext for discrimination. (Def.'s Br.)

On September 25, 2007, Plaintiff filed her response brief.  (Pl.'s Resp.)  On October 15, 2007,

Defendant filed a reply brief.  (Def.'s Reply.)

On October 30, 2007, Plaintiff filed a motion for leave to file a surreply.  (Mot. for Leave

to File Surresponse [sic] [filed Oct. 30, 2007].)  Therein, Plaintiff requested that "she be given

leave to file her surresponse [sic] by November 13, 2007."  (*Id.*)  Defendant opposed the motion.

(Opp'n to Pl.'s Mot. for Leave to File Surresponse [sic] [filed Oct. 31, 2007].)  On November 1,

2007, I denied Plaintiff's motion *without prejudice*, stating:

> Instead of following the established practice of tendering a surreply along with her
> motion, Plaintiff seeks leave to file a surreply by November 13, 2007.  The court
> will not rule definitively on a motion to file a surreply that is not accompanied by a
> proposed surreply.  By way of guidance, the court notes two facts: (1) the
> summary judgment reply brief to which Plaintiff seeks to respond was filed fifteen
> days before the instant motion; and (2) during those fifteen days, while Plaintiff sat
> in silence, the court took up consideration of the summary judgment motion.  Time
> is of the essence.

(Order [filed Nov. 1, 2007].)  Anticipating that a surreply would be filed, I tabled consideration of

the case for nearly two months.  During that time, Plaintiff did not renew her motion for leave to

file a surreply.

## ANALYSIS

### 1.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)

(2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2007). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.    *Evaluation of Claims*

### a.    **Prima Facie** *Case*

Title VII prohibits employment discrimination based on race and gender. 42 U.S.C.A § 2000e–2(a)(1) (West 2007). Title IX prohibits gender discrimination "under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681 (West 2007).

"Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Okla. ex rel. Bd. of Regents*, 245 F.3d 1172, 1176 (10th Cir. 2001).

Plaintiff does not contend that she has direct evidence of discrimination. (*See* Pl.'s Resp.) Thus, the case must proceed under the familiar *McDonnell Douglas* burden-shifting scheme. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, Plaintiff bears the burden of establishing a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). A *prima facie* case of discrimination consists of proof that: (1) Plaintiff belongs to a protected class; (2) she was qualified for tenure; (3) she sought but did not receive tenure; and (4) the position was filled with a non-protected person or remained available following the decision not to promote her.[5] *Cuenca v. Univ. of Kan.*, 265 F. Supp. 2d 1191, 1207 (D. Kan. 2003) (citing *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 n.6 [10th Cir. 2000]; *Amro v. Boeing Co.*, 232 F.3d 790, 796 [10th Cir. 2000]).

Because Defendant only attacks Plaintiff's *prima facie* case at the second prong, I assume without deciding that Plaintiff has satisfied the remaining elements. Defendant asserts Plaintiff has failed to come forward with sufficient proof that she was qualified for tenure. (*See* Def.'s Br. at 16–17.) Plaintiff contends that her qualifications are demonstrated by the fact that "a majority of her external reviewers . . . recommended that she receive tenure." (Pl.'s Resp. at 25.) Plaintiff is

---

[5]Defendant contends that the fourth prong should be articulated as such: "the circumstances [of Plaintiff's denial] give rise to an inference of discrimination." (Def.'s Br. at 14–15.) The Tenth Circuit has criticized such a *prima facie* requirement, stating it "conflates the distinct steps of the *McDonnell Douglas* inquiry." *Rolland v. Primesource Staffing, LLC*, No. 06-1491, 2007 WL 4205871, at *3 (10th Cir. Nov. 29, 2007). Thus, at the *prima facie* stage, it is inappropriate to consider Defendant's premature pretext-related arguments.

correct. Where, as here, the majority of a tenure candidate's outside reviewers support tenure, the candidate has *prima facie* proof of qualification. *Aquilino v. Univ. of Kan.*, 83 F. Supp. 2d 1248, 1255 (D. Kan. 2000); *accord Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992) (holding that plaintiff could make a *prima facie* showing of qualification with her own testimony and that of coworkers).

### b. *Legitimate, Nondiscriminatory Reason*

Once a plaintiff comes forward with *prima facie* proof, the burden of production shifts to the defendant to articulate a facially nondiscriminatory reason for its decision. *Reeves*, 530 U.S. at 143. Defendant argues that it did not grant tenure because Dr. DiStefano determined that, given Plaintiff's funding, publications, and external letters, Plaintiff's dossier failed to show "excellence in research." (Def.'s Br. at 17; *see also* Def.'s Reply at 12, 15 n.4.) Plaintiff argues that Dr. DiStefano's "subjective" determination is insufficient to satisfy Defendant's burden of production. (Pl.'s Resp. at 28.) I disagree.

To satisfy its "exceedingly light" burden of production, *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165 (10th Cir. 2007) (en banc), a defendant must "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII," *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992). "[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated

against the plaintiff. To accomplish this, the defendant must clearly set forth . . . the reasons for the plaintiff's rejection." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 257 (1981).

> Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's *prima facie* case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Id.* at 255–56; *accord Flasher*, 986 F.2d at 1318 ("The articulation of a . . . nondiscriminatory reason . . . defines the parameters of the trial, as the plaintiff then knows the precise reason that he or she may try to show is only a pretext for an illegal discriminatory motive.").

Plaintiff urges that this court should adopt the reasoning applied by the Eleventh Circuit in *Chapman v. AI Transport*, 229 F.3d 1012, 1033, 1035 (11th Cir. 2000). (Pl.'s Resp. at 28.) In *Chapman*, the employer asserted it denied the plaintiff-applicant a supervisory position based on a "poor interview" in which he was "not concise with his answers" because the position required the use of precise language to communicate with technicians. 229 F.3d at 1033, 1035. The plaintiff-applicant argued that this reason — and, indeed, *any* subjective nondiscriminatory reason — was legally insufficient. *Id.* at 1035. Pointing to *Burdine*'s requirement that an employer's articulated reason be "clear and reasonably specific," the Eleventh Circuit stated:

> A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion. . . . [I]t might not be sufficient for a defendant employer to say it did not hire the plaintiff applicant simply because "I did not like his appearance" with no further explanation. However, if the defendant employer said, "I did not like his appearance because his hair was uncombed and he had

dandruff all over his shoulders," or "because he had his nose pierced" . . . the defendant would have articulated a "clear and reasonably specific" basis for its subjective opinion — the applicant's bad (in the employer's view) appearance. That subjective reason would therefore be a legally sufficient, legitimate, nondiscriminatory reason for not hiring the plaintiff applicant.

*Id.* at 1034; *accord EEOC v. Target Corp.*, 460 F.3d 946, 957–58 (7th Cir. 2006); *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004). The court then determined that, given the passage of time between the interview at issue the testimony of the defendant's interviewers, the defendant had come forward with a "clear and reasonably specific" explanation for its decision. *Chapman*, 229 F.3d at 1035.

In evaluating whether Plaintiff had attained excellence in research, Dr. DiStefano determined that Plaintiff's "publication record demonstrated a modest volume of well-received articles since joining MCDB, but her publication record did not establish excellence in research." (Def.'s Br., Ex. 1 ¶ 28 [DiStefano Decl.]; *see also* Def.'s Reply, Ex. 6 ¶ 1 [DiStefano Suppl. Decl.].) Dr. DiStefano determined that, during Plaintiff's time at UCB, she had received only two independent grants totaling about $600,000. (Def.'s Br., Ex. 1 ¶¶ 31–32 [DiStefano Decl.]; *see also* Def.'s Reply, Ex. 6 ¶ 3 [DiStefano Suppl. Decl.].) To demonstrate excellence in research, Dr. DiStefano believed Plaintiff should have demonstrated a stronger history of funding. (*Id.*) Dr. DiStefano also considered Plaintiff's external letters, but found them insufficient to overcome the weaknesses in her funding and publications. (Def.'s Br., Ex. 1 ¶¶ 32–33 [DiStefano Decl.].)

While these proffered reasons are not a model of clarity, they are at least as clear as the reason the Eleventh Circuit accepted in *Chapman*, and are much more clear than the conclusory statements that other courts have rejected as insufficient. *See, e.g., Target Corp.*, 460 F.3d at 958

-19-

(rejecting as insufficient employer's explanation that "'[b]ased upon [the plaintiff's] interview, [it] decided that [he] did not meet the requirements for [the] position, and therefore elected not to hire him'"); *Patrick*, 394 F.3d at 317 (stating employer's "bald and amorphous statement that [the plaintiff] simply was 'not sufficiently suited'" for the job was insufficient); *Casey v. Clayton County*, No. Civ.A.1:04CV00871, 2006 WL 870379, at *9 (N.D. Ga. Mar. 30, 2006) (determining interviewer's explanation that another applicant "appeared 'more knowledgeable as to how you should do certain things or she presented it in a more knowledgeable way'" was not clear and reasonably specific). Moreover, given Plaintiff's extensive critique of these stated reasons in her response brief, it is clear that Dr. DiStefano's proffered reasons "framed the factual issues" to such an extent that Plaintiff had a full and fair opportunity to demonstrate pretext. *See Burdine*, 450 U.S. at 256. Thus, I find that Defendant has proffered sufficiently clear and specific nondiscriminatory reasons for its actions.

### c. Pretext

Once a defendant's burden of production is met, the plaintiff may "resist summary judgment, either by presenting evidence that the employer's reason is pretextual, *i.e.*, unworthy of belief, or by otherwise introducing evidence of a discriminatory motive." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002). Pretext may be shown "by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* "When assessing whether [a] plaintiff has made an appropriate showing of pretext,

[courts] must consider the evidence as a whole." *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 242 [1976]).

In evaluating pretext evidence, "the relevant inquiry is not whether the employer's reasons were wise, fair or correct; [it] is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007) (citation omitted). Thus, a court must consider the facts as they appeared to the person making the decision, and a court will not "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Id.* at 1119. "The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

Here, Plaintiff argues that an inference of pretext for unlawful discrimination can be drawn from: (1) an analysis of her history of funding; (2) a comparison of her research to that of Dr. Jones; (3) Dr. DiStefano's conduct; (4) Dr. DiStefano's history of tenure decisions; and (5) Dr. Yoshinaga-Itano's email. (Pl.'s Resp. at 30–35.) Before I consider these arguments, I pause to contemplate the parties' unusual approach to this dispute.

### i. *Nature of the Evidence*

In the instant case, virtually all of the evidence and arguments presented relate to Dr. DiStefano's tenure decision. This approach makes sense from Defendant's perspective, since it appears that Defendant uses Dr. DiStefano's ultimate decision, purportedly based on his "review of [Plaintiff's] entire updated dossier," to avoid exploration of the extensive review process that

preceded it.  (*See* Def.'s Br., Ex. 1 [DiStefano Decl.].)  Surprisingly, Plaintiff does not fight this approach and, with but one minor exception, engages Dr. DiStefano's evaluation to the exclusion of what transpired below him.  (*See* Pl.'s Resp.)  Perhaps Plaintiff took this approach in light of recent precedent.  *See generally EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 487 (10th Cir. 2006) ("To prevail on a subordinate bias claim, a plaintiff must establish more than mere 'influence' or 'input' [from biased subordinates] in the decisionmaking process.  Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions *caused* the adverse employment action." [emphasis added]).  Thus, while the multilayered process that preceded Dr. DiStefano's decision is relevant background to this case, in light of the manner in which this case has been presented, Plaintiff's success on summary judgment chiefly hinges on her ability to rebut Dr. DiStefano's testimony and cast doubt upon the credibility of his asserted nondiscriminatory reasons for denying tenure.  *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169 (10th Cir. 2007) ("We have . . . upheld summary judgment for the employer based on the employer's own alternative, nondiscriminatory explanations, so long as they remain unrebutted and the employer's credibility has not been so damaged as to render such explanations suspect.").

### ii.    *Funding*

Dr. DiStefano asserts that he determined Plaintiff had not demonstrated excellence in research because she received only two grants as principal investigator during her probationary period, totaling approximately $600,000.  (*See* Def.'s Br., Ex. 1 ¶¶ 29–32 [DiStefano Decl.]; Def.'s Reply at 15 n.4, Ex. 6 ¶ 1 [DiStefano Suppl. Decl.].)  Plaintiff's own evidence confirms this

contention.  The first independent grant Plaintiff received while at UCB, the $435,000 "JDF"

grant,[6] was awarded in 1997 and ran through 2001.  (Pl.'s Resp., Ex. 1 at JL–7 [Pl. Funding

Chart].)  From 2002 through 2003, Plaintiff received no independent grant funding at all.  (*See*

*id.*)  In 2004, Plaintiff was awarded a two-year, $165,000 "JDF P&L" grant.  (*See id.*)

It appears that Plaintiff attempts to rebut Dr. DiStefano's conclusion roundabout, by

asserting that during her probationary period, she was awarded two more grants as "Co-

P[rincipal] I[nvestigator]," totaling about $700,000.  (*See id.*)  Plaintiff never explains the

meaning of the term "Co–PI."  (*See id.*)  Nor does Plaintiff offer *any* discussion relating to the

nature of the two grants she claims to have received as "Co-PI."  (*See id.*)  In response to this

evidentiary gap, Defendant proffers the supplemental affidavit testimony of Dr. DiStefano,

asserting that each of the two grants which Plaintiff purports to have received as "Co-PI" were

actually awarded *to other researchers* and that "*some* of the awarded money was passed through

to [Plaintiff] as the researcher on a subcontracted project."  (Def.'s Reply, Ex. 6 ¶ 3 [Distefano

Suppl. Decl.] [emphasis added].)  Nothing in the record rebuts Dr. DiStefano's representation.[7]

---

[6]I refer to Plaintiff's grants by the abbreviated titles she gave them on her funding chart.
(*See* Pl.'s Resp., Ex. 1 at JL–7 [Pl. Funding Chart].)

[7]Rule 56(c) "requires that if the court relies on new materials or arguments in a reply brief,
*it may not forbid* the nonmovant from responding to these new materials."  *Beaird v. Seagate
Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) (emphasis added).  Here, I denied Plaintiff's
motion for leave to file a surreply without prejudice due to her failure to tender a surreply.  (*See
Facts* § 3, *supra*.)  Plaintiff did not refile her motion.  Consequently, it is appropriate for me to
rely upon the portions of Dr. DiStefano's supplemental affidavit that are directly responsive to
Plaintiff's brief.  *See Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996)
("Where the reply affidavit merely responds to matters placed in issue by the opposition brief and
does not spring upon the opposing party new reasons for the entry of summary judgment, reply

In light of Plaintiff's failure to explain her strange claim that she received two grants as "Co-PI" and Dr. DiStefano's unrebutted testimony that such grants were awarded to *other researchers* and were funneled to Plaintiff for work on subcontracted projects, I cannot say that there is any evidence from which a reasonable factfinder could conclude that Dr. DiStefano's criticism of Plaintiff's funding was *in*correct — let alone that it constitutes pretext for intentional discrimination. *Cf. Piercy v. Maketa*, 480 F.3d 1192, 1199 (10th Cir. 2007) ("Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision. . . .").

Nevertheless, without a *single* record citation, Plaintiff makes a weak volley of attempts to cast a shadow of doubt upon the import of being the principal investigator on a grant. (Pl.'s Resp. at 30–31.) First, Plaintiff argues that a jury could reasonably infer that being principal investigator is "unimportant" because MCDB tenure criteria, those involved in her comprehensive evaluation, and those who submitted external review letters all failed to mention the significance of being the principal investigator on one's grants. (*Id.* at 30.) This argument is quite a stretch. It beyond dispute that being the principal investigator simply means being the person to whom the grant was awarded. (Def.'s Br., SOF ¶¶ 34–35; *admitted in relevant part at* Pl.'s Resp., RSOF ¶¶ 34–35; Def.'s Reply, Ex. 6 ¶ 5 [DiStefano Decl.].) The failure to state the obvious — *i.e.*, that it is more prestigious to receive a grant for *your* work than to be given money by others who were awarded grants for *their* work — is not reasonable a basis for inferring that the obvious is a

_____

papers — both briefs and affidavits — may properly address those issues.").

-24-

fiction. Plaintiff cannot cast doubt upon Defendant's assertion that the sky is blue by decrying Defendant's failure to tell her that the sky is blue.

While Plaintiff complains at length about the wisdom of Dr. DiStefano's decision to analyze her grants by looking only at independent grants she received during her probationary period, (*see* Pl.'s Resp. 29–30, 34), Plaintiff has failed to rebut Dr. DiStefano's assertion that he takes this approach in *all* the tenure decisions he makes, (*see* Def.'s Br., SOF ¶¶ 34, 40.) However, a challenge of pretext "requires a court to look at the facts as they appear to the person making the decision to terminate, *not the aggrieved employee*." *Piercy*, 480 F.3d at 1200 (emphasis added). Plaintiff has come forward with no evidence that Dr. DiStefano has granted tenure to others who did not receive their funding as principal investigator. (*See* Pl.'s Resp.) Nor has Plaintiff come forward with evidence that Dr. DiStefano has granted tenure based on consideration of grants obtained prior to other candidates' probationary periods. (*See id.*) Had Plaintiff had proffered such evidence, she would have a strong case for pretext. Absent evidence that Dr. DiStefano's approach was adopted or applied in bad faith, though, an attack on the wisdom or fairness of the application of neutral criteria gets Plaintiff nowhere. *See Riggs*, 497 F.3d at 1118–19 ("[T]he relevant inquiry is not whether the employer's reasons were wise, fair or correct; [it] is whether the employer honestly believed its reasons and acted in good faith upon them.").

Second, Plaintiff points out that Dr. Jones' tenure dossier "contains no indication that he was the [principal investigator] on any of [his] grants."[8] (Pl.'s Resp. at 31.) Thus, Plaintiff suggests that a reasonable juror could infer that Dr. DiStefano had no idea whether Dr. Jones was the principal investigator on his grants at the time he recommended that Dr. Jones be granted tenure. (Id.) Dr. DiStefano's undisputed testimony is as follows: "When a grant listed on a CV does not state the name of the [p]rincipal [i]nvestigator, it is understood that the [p]rincipal [i]nvestigator is the author of the CV. Thus, if Dr. Jones did not list someone else on his grants, it would indicate that he was the [p]rincipal [i]nvestigator on the grants." (Def.'s Reply, Ex. 6 ¶ 5 [DiStefano Decl.].) In light of this uncontroverted testimony, I find that Plaintiff's argument fails to raise a genuine issue of material fact.

Third, Plaintiff takes a slightly different tack, arguing that the failure of MCDB to inform her of the importance of receiving independent grant funding constitutes a "disturbing procedural irregularit[y]" warranting an inference of pretext. (Pl.'s Resp. at 32.) It is true that "disturbing procedural irregularities," such as the manipulation of promotion-related criteria, may support an inference of pretext. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002). However, MCDB's failure to tell Plaintiff it is more prestigious to receive a grant than to rely on other people for grant funding is hardly disturbing, let alone irregular. Moreover, even assuming that failing to state the obvious could be considered a "procedural irregularity," such an irregularity hardly supports an inference of pretext. Plaintiff failed to show that MCDB treated

---

[8]Dr. Jones' dossier is not part of the record before the court. (*See* Def.'s Br.; Pl.'s Resp.; Def.'s Reply.)

any of its other tenure candidates any differently — *i.e.*, by letting them in on the "secret" that, in the world of grant funding, it is better to receive from grantors than from grantees. *See Aquilano v. Univ. of Kan.*, 83 F. Supp. 2d 1248, 1257 (D. Kan. 2000) (finding plaintiff's failure to show that a purported procedural irregularity impacted her any differently than anyone else undermined an inference of pretext). No reasonable inference of pretext can be drawn from these facts.

### iii.    *Comparison to Dr. Jones*

Plaintiff next compares her research performance to that of Dr. Jones, asserting that her history of publications, external letters, and grant funding reveal that she is significantly more qualified that Dr. Jones. (Pl.'s Resp. at 33–34.) Defendant argues: "[Plaintiff] urges this [c]ourt to infer race and gender discrimination if the [c]ourt finds [Plaintiff] to be more qualified than Dr. Jones [using] [Plaintiff's] evaluative framework. . . . [Plaintiff] has not alleged that [Dr.] DiStefano's allegedly inferior evaluative method was not similarly applied to other tenure candidates." (Def.'s Reply at 14–15.)

While Defendant is right to be wary of the precariousness of an *ex post facto* comparison of two candidates who were never actually considered head-to-head, a comparison of two similarly situated candidates could nevertheless yield pretext evidence. *See, e.g.*, *Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007), *cert. denied* 127 S. Ct. 2941 (2007). Even when comparing candidates for the same position, however, courts are hesitant to engage in retrospective second guessing and, thus, will draw an inference of pretext only where "the facts *assure* [them] that the plaintiff is better qualified than the other candidates for the position." *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003) (emphasis added); (*accord* Pl.'s Resp.

-27-

at 33 [asserting that application of the *Jones* standard is appropriate here]).  I undertake this comparison with the further consideration in mind that "[f]ederal courts are not particularly well-suited to the task of evaluating the criteria for successful tenured professors and are particularly ill-suited to determine the best candidates."  *Babbar v. Ebadi*, 216 F.3d 1086, 2000 WL 702428, at *6 (10th Cir. May 26, 2000) (table); *accord Vanasco v. Nt'l-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998) ("[T]enure decisions are often based on the distinction between competent and superior achievement.  Such decisions necessarily rely on subjective judgments about academic potential.  Experienced faculty members may well come to different conclusions when confronted with voluminous and nuanced information about a colleague's overall capacity to make a long-term institutional contribution.").

While I agree that Plaintiff has proffered evidence that her publications and external letters were stronger than those of Dr. Jones, the evidence cannot support a reasonable sense of "assurance" that Plaintiff was a better candidate than Dr. Jones unless Plaintiff can also show that her grant funding was superior.  *See Jones*, 349 F.3d at 1267.  When Plaintiff's and Dr. Jones' records are compared with regard to funding, the only reasonable inference to draw is that Plaintiff's independent funding was substantially lower than that of Dr. Jones during the relevant probationary periods.

During her probationary period, Plaintiff received only $600,000 from new, independent grants.  (Pl.'s Resp., Ex. 1 JL–7 [Pl. Funding Chart].)  In contrast, during Dr. Jones' probationary period, he received $1,172,000 in new, independent funding.  (*Id.*, Ex. 1 at JL–6 [Jones Funding Chart].)  Moreover, Dr. Jones' probationary period spanned only eight years, while Plaintiff's

-28-

spanned nine years.  (*See id.*, Ex. 1 at JL–6 [Jones Funding Chart], JL–7 [Pl. Funding Chart].)

Thus, it is clear that Dr. Jones squarely outperformed Plaintiff with regard to extramural support

for his research program.  Such a disparity undermines any evidence from which a factfinder could

reasonably conclude that Plaintiff "assuredly" outperformed Dr. Jones.  *Jones*, 349 F.3d at 1267.

In an attempt to avoid this conclusion, Plaintiff tries to inflate her grant numbers by

counting grants she purports to have received as "Co-PI" as well as grants she attained prior to

her probationary period.  (*See* Pl.'s Resp. at 34.)  I am not impressed with this approach.  I have

already addressed the uncontroverted evidence refuting the validity of Plaintiff's inclusion of the

"Co-PI" grants, and I will not rehash that analysis here.  With regard to grants awarded prior to

her probationary period, it is true that Plaintiff did bring almost $900,000 in such pre-probationary

grants with her to UCB from 1997 through 1999.  (*See id.*, SOF ¶¶ 63–69, Ex. 1 at JL–7 [Pl.

Funding Chart].)  It is also true that, because of these grants, Plaintiff received well over

$300,000 in independent funding during each of her first three years at UCB.  (*Id.*, Ex. 1 at JL–7

[Pl. Funding Chart].)  And it is true that such yearly funding levels are well in excess of the

funding Dr. Jones received in any single year of his probationary period.  (*See id.*, Ex. 1 at JL–6

[Jones Funding Chart].)  In parading her purported grant successes, however, Plaintiff does not

point out that once her pre-probationary grants expired at the end of 1999, her independent

funding dropped off precipitously and never rebounded.  (*See id.*, Ex. 1 at JL–7 [Pl. Funding

Chart].)  Nor does Plaintiff point out that, in stark contrast to Dr. Jones, she received *no*

*independent funding* for two consecutive years of her probationary period, 2002 and 2003.  (*See*

*id.*)  As such, I reject Plaintiff's attempt to spin the evidence to inflate her numbers relative to

those of Dr. Jones.  It remains undisputed that Dr. Jones obtained significantly more independent grant funding during his probationary period than Plaintiff did during her probationary period.

### iv. *The Meeting with Dr. DiStefano*

Next, Plaintiff argues that Dr. DiStefano's initial refusal of her request to discuss her tenure denial "suggests a consciousness of wrongdoing" that is further supported by his "utter inability to provide" a coherent explanation of his decision when he did meet with Plaintiff.  (Pl.'s Resp. at 32–33.)  This argument is at odds with the record and the relevant case law.

The undisputed evidence reveals that, on June 27, 2005, Dr. DiStefano denied Plaintiff's initial request to meet.  (*Id.*, SAF ¶ 82; *admitted at* Def.'s Reply, RSAF ¶ 82.)  The same day, Plaintiff again requested a meeting, providing Dr. DiStefano with a provision from UCB's faculty handbook stating that, upon request from a rejected tenure candidate, the Chancellor must meet to discuss the tenure denial.  (*Id.*, SAF ¶ 83; *admitted at* Def.'s Reply, RSAF ¶ 83.)  The next day, Dr. DiStefano agreed to meet with Plaintiff.  (*Id.*, SAF ¶ 84; *admitted at* Def.'s Reply, RSAF ¶ 84.)  The evidence further reveals that, at the time Plaintiff met with Dr. DiStefano, she had yet to exhaust all of her internal appeals with regard to her case.  (*See* Def.'s Br., SOF ¶ 42; *admitted at* Pl.'s Resp., RSOF ¶ 42.)

Dr. DiStefano's initial failure to follow the faculty handbook provision hardly supports a reasonable inference that he denied Plaintiff's tenure based on her race and gender.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 39, 45 (2d Cir. 2000) (finding provost's initial failure to answer two letters from plaintiff requesting an explanation that was mandated by tenure rules failed to support an inference of pretext).

Moreover, any inference one might draw from the initial refusal to meet is undermined by the transcript of the meeting. Plaintiff's affidavit assertion that, at the meeting, Dr. DiStefano "refused to advise [her] of any specific reason which contributed to his rejection of her tenure candidacy," (Pl.'s Resp., Ex. 1 ¶ 35 [Pl. Aff.]), is unsupported by the transcript of the conversation, (*see* Def.'s Reply, Ex. 6, Attach. D at 1–14 [Meeting Trans.]). While the transcript is imperfect, with a number of "inaudible" words on each page, nothing therein suggests that Dr. DiStefano was stonewalling Plaintiff. (*See id.*) Throughout the course of the conversation, Plaintiff posed a large number of questions regarding various aspects of the tenure review process, and Dr. DiStefano answered them. (*Id.*) Perhaps tellingly, much of the conversation appears to have been focused on events not raised by Plaintiff in connection with this lawsuit. (*See id.*) Dr. DiStefano did state that he read everything in Plaintiff's dossier "probably three different times" and determined that Plaintiff's record revealed "meritorious" rather than "excellent" research because, although Plaintiff's publications were strong, support for her research was weak. (*Id.*, Ex. 6, Attach. D at 3, 5 [Meeting Trans.].) Dr. DiStefano repeatedly stated that he agreed with the Dean's May 10, 2005, letter regarding Plaintiff's candidacy.[9] (*Id.*, Ex. 6, Attach. D at 3–6 [Meeting Trans.].) Viewing the transcript in the light most favorable to Plaintiff, I find that the evidence fails to support a reasonable inference that Dr. DiStefano was evasive during the meeting. At best, the transcript reflects that his approach was cautious. (*See id.*, Ex. 6, Attach. D [Meeting Trans.].) Caution in the context of a highly contentious tenure

---

[9]Plaintiff never discusses this letter, and it is not part of the record before the court. (*See* Pl.'s Resp.; Def.'s Br.; Def.'s Reply.)

review still subject to internal appeal is to be expected — and fails to support a reasonable inference of pretext.

> v.     **"Statistics"**

Plaintiff argues that Dr. DiStefano's history of tenure decisions supports an inference of pretext.  (*See* Pl.'s Resp. at 35; Def.'s Br., Ex. 1, Attach. C [DiStefano Tenure Cases].)  I cannot agree.

The submitted data reveal that Dr. DiStefano denied tenure to about nine percent (10 out of 113) of female tenure candidates, versus about seven percent (15 out of 204) of male tenure candidates.  (Def.'s Br., Ex. 1, Attach. C [DiStefano Tenure Cases].)  I fail to see how this mere two percent difference could support a reasonable inference that Dr. DiStefano denied Plaintiff tenure based on her gender.  Even if it could, Plaintiff makes no effort to show that the other candidates Dr. DiStefano reviewed were similarly situated.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir. 1994) (rejecting statistical data "not based upon a comparative analysis of similarly situated individuals"); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation . . . .").

The data further reveal that Dr. DiStefano denied tenure to about twelve percent (5 out of 35) of Asian tenure candidates, versus about eight percent (20 out of 255) of non-Asian tenure candidates.  (Def.'s Br., Ex. 1, Attach. C [DiStefano Tenure Cases].)  Even assuming that all these candidates were similarly situated, I find that the mere four percent difference here fails to support a reasonable inference of discrimination.  Further assuming the four percent difference

could support an inference of discrimination, the relatively small sample size of Asian candidates suggests that statistics derived therefrom are unreliable. *See Baker v. Ogden Servs. Corp.*, 74 F.3d 1248, 1996 WL 15490, at *4 (10th Cir. Jan. 16, 1996) (table) ("'[T]he smaller the sample size, the greater the likelihood that the underrepresentation reflects chance rather than discriminatory practices.'" [quoting *Stendebach v. CPC Int'l, Inc.*, 691 F.2d 735, 738 (5th Cir. 1982)]). Thus, these statistics are entirely unavailing.

### vi. *Yoshinaga-Itano Email*

Finally, I turn to the one aspect of Plaintiff's evidence that looks beyond Dr. DiStefano's June 2005 decision. In her brief, Plaintiff devotes three curt sentences to her "analysis" of the April 15, *2004*, email Dr. Yoshinaga-Itano sent to Dr. DiStefano. (*See* Pl.'s Resp. at 34–35.) In the email, Dr. Yoshinaga-Itano asserted that a recent vote regarding Plaintiff evinced "a clear case of gender and racial discrimination" because MCDB "use[d] significantly different criteria in the evaluation of a white male in the same area of research." (*Id.*, SAF ¶¶ 94–95; *admitted at* Def.'s Reply, RSAF ¶¶ 94–95; Pl.'s Resp., Ex. 23 [4/15/04 Email].) The date of this email reveals it was made in connection with Plaintiff's first, aborted tenure review, which took place during the 2003–2004 academic year. (*See* Def.'s Br., SOF ¶¶ 7–8; *admitted at* Pl.'s Resp., RSOF ¶¶ 7–8.) Plaintiff does not point the court to any evidence connecting this isolated statement to her 2004–2005 tenure review. (*See* Pl.'s Resp. at 34–35.) Instead, Plaintiff merely states that this "inculpatory statement" is "relevant to the issue of pretext." (*Id.*) Absent any explanation of *how* this otherwise disconnected statement is inculpatory, I am at a loss to understand upon what basis

such a statement is "relevant" to the question whether Defendant is lying to hide the fact that it

denied Plaintiff tenure based on her race or gender.

Even assuming that the 2003–2004 MCDB evaluation was somehow marred by

discrimination, the fact that Defendant saw fit to attempt to correct such irregularities by offering

Plaintiff a second review in 2004–2005 undermines an inference of pretext arising out of the first

evaluation. *See Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005) ("We do not want

to turn the tenure process into potentially endless litigation over each intermediate step, and

believe that a university should have the opportunity to correct errors through its complete

internal appeals process that precedes its final decision."). And such an inference is further

undermined by the fact that, in connection with Plaintiff's 2004–2005 review, MCDB was not

given the last word in Plaintiff's review. After MCDB reviewed Plaintiff's dossier, her candidacy

was independently reviewed by two other committees, the Dean, the Provost, and, ultimately, the

Chancellor. *See BCI Coca-Cola*, 450 F.3d at 487 (where discriminatory reports of biased

subordinates do not cause an employment decision made by a superior, employer will not be held

liable for subordinate bias).

Moreover, Dr. Yoshinaga-Itano's explanation of her views regarding Plaintiff's case

undermines whatever unexplained inference Plaintiff would have the court draw from the email.

In deposition, Dr. Yoshinaga-Itano testified as follows:

> Q: I want you to, as best you can, specifically tell me why you think [Plaintiff]
> was the victim of discrimination.
> A: I think that when [she] went to ask for information much prior to the
> tenure and promotion review itself, that the information provided to her
> was not correct. And based on that information, a series of events

> unfolded, which had a significantly negative impact on [Plaintiff's] pre-tenure time period. So that begins the problem. I mean, it's very difficult for me to talk about only the tenure and promotion review, because the story begins for each faculty [sic] from the moment they are hired and what happens after they are hired in terms of the mentorship and support and accuracy of information that is provided to the individual.

(Def.'s Reply, Ex. 7 at 40 [Yoshinaga-Itano Dep.].) Plaintiff's brief is devoid of any allegations suggesting that the person or persons who may have given Plaintiff "incorrect information" early in her tenure at UCB did so for discriminatory reasons. Moreover, Plaintiff's brief is devoid of any allegations that such persons were involved in Plaintiff's tenure decision — let alone that the ultimate decisionmaker in this case, Dr. DiStefano, was aware of such involvement or relied on any discriminatory reports or recommendations from such unidentified persons in making the ultimate tenure decision. *See BCI Coca-Cola*, 450 F.3d at 487. As such, Dr. Yoshinaga-Itano's vague statements about events transpiring in the indeterminate past fail to support a reasonable inference that Dr. DiStefano's stated reasons for denying Plaintiff tenure in June 2005 are pretext for discrimination.

Having considered the evidence as a whole and having construed such evidence in the light most favorable to Plaintiff, I find that Plaintiff has failed to demonstrate a genuine issue for trial on a material matter. As such, summary judgment is warranted.

### 3.     *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.     DEFENDANT's motion (#32) is GRANTED.

2.     DEFENDANT's motion (#16) is DENIED as moot.

-35-

3.      The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiff, dismissing Plaintiff's claims with prejudice.  Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

Dated this 8th day of January, 2008

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge